UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
J&J SPORTS PRODUCTIONS, INC.
                         Plaintiff,

            -against-                                             Civil Action No. 08-2869

HEVERES CORP.
d/b/a MI PALENQUE BAR & RESTAURANT
and ADELINA RUIZ
and FRANCISCO RUIS
                         Defendant,
-----------------------------------------------------X

## PROPOSED FINDINGS OF FACT AND CONCLUSION OF LAW

This proceeding is before the Court on Motion for a Default Judgment.  Based upon the

evidence the Court enters the following Findings of Fact and Conclusions of Law:

## PROPOSED FINDING OF FACT

_____The relevant facts can be briefly stated and are fully set forth in the accompanying

exhibits and Plaintiff's underlying Complaint.  Plaintiff, J&J Sports Production, Inc. brought this

action on March 18, 2008, alleging that the Defendants hereto knowingly and willfully violated

the Communications Act of 1934 , as amended, 47 U.S.C. §605(1996).  The Complaint, alleges

that the Defendants, operators of taverns and restaurants in the New York City Area, unlawfully

intercepted and exhibited the Erik Morales and Manny Pacquiano pay-per-view boxing event on

March 19, 2005.  Copies of the Summons and Complaint were served on Defendants, Adelina

Ruiz and Francisco Ruiz, Individually and Heveres d/b/a Mi Palenque Bar & Restaurant as set

forth in the proofs of service by Darryl Green, which were filed with the Court on April 25, 2008.

As for paragraph 8 of the Complaint, Plaintiff entered into a closed-circuit television

license agreement to exhibit the closed-circuit telecast of the March 19, 2005 boxing match

between Erik Morales and Manny Pacquiano, including undercard or preliminary bouts (the

boxing match and all related bouts are collectively referred to as the "Event") Plaintiff owns the

distribution rights to the March 19, 2005 Erik Morales and Manny Pacquiano boxing event,

which was broadcast either by closed circuit television or by encrypted satellite signal.  For a fee,

commercial establishment could legitimately receive an unscrambled signal, enabling them to

view the program by contracting with the Plaintiff.  However, through the use of methods that

required the performance of some deliberate and willful act, potential purchasers, such as the

Defendants herein, illegally obtained programs without paying the plaintiff for the rights to

exhibit said event.

In order to combat the serious erosion of market sales caused by such piracy, plaintiff

hired investigative agencies to retain independent auditors to visit various bars and restaurants in

the New York City area on the night of March 19, 2005, to see whether these establishments

were intercepting and publicly displaying the Erik Morales and Manny Pacquiano boxing event

without authorization from, or payment to, plaintiff and its affiliates.

The auditors visited numerous locations where the Erik Morales and Manny Pacquiano

boxing event was exhibited.  Among the locations the auditors observed exhibiting the Erik

Morales and Manny Pacquiano match without authority to do so was that of the defendant,

Heveres d/b/a Mi Palenque Bar & Restaurant, located at 154 E. 112th Street, New York, NY

10029   Defendants' display of the event was verified by independent auditor Patricia Ferraro.

The auditor entered the defendant's establishment and paid a $0.00 cover charge and saw 1

television sets exhibiting a portion of the event to 55 individuals in the establishment.  The

exhibition most likely led to an increased number of patrons and, thus, an increase in profits from

food and beverages, all to the financial detriment of plaintiff and its legitimate customers.

After proper service on the defendants, the defendants herein did not answer or otherwise appear within the time to answer, nor did they request an extension of time to file. Plaintiff sought entry of default, which was granted by the Clerk of the Court on July 7, 2008. Said defendants are not infants or incompetents. Upon information and belief, the defendants are not presently in the military service of the United States.

## CONCLUSION OF LAW

The Statute in General

The Statute provides inter alia that:

> [n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. §605(a). Thus, it protects against the theft of satellite communications such as the Event. See e.g., Cimenelli v. Cablevision, 583 F.Supp. 158, 161 (E.D.N.Y. 1984); Cablevision Systems Development Co. v. Annasonic Electronic Supply, No. CV-83-5189 (E.D.N.Y. February 10, 1984); Cablevision Systems Coup. v. DePalma, No. CV 87-3528 (E.D.N.Y. January 17, 1989); California Satellite Systems v. Seimon, 767 F.2d 1364 (1985); Quincy Cablesystems, Inc. v. Sully's Bar, Inc., 640 F.Supp. 1159 (D. Mass. 1986); National Subscription Television v. S & H TV, 644 F.2d 820 (9th Cir. 1981); National Football League v. Alley, Inc., 624 F.Supp. 6 (S.D. Fla. 1983). Accordingly, all acts of unlawful interception, receipt and broadcast of the signal of the Event were in violation of the Statute.

In order to deter the unlawful use of communications such as the Event,

Congress specifically designed the Statute to provide "both Prosecutor[s] and civil plaintiffs [with] the legal tools they need to bring piracy under control."  Trademark & Satellite Acts, P.L.-6678, 1988 U.S. Cong. & Admin. News 7, 5577, 5658; See U.S. v. Scott, 783 F.Supp. 280, 281 (N.D. Miss. 1992).  Therefore, the Statute includes severe penalties, both civil and criminal, for those who intercept, receive and/or broadcast protected communications.  See Scott, 783 F.Supp. at 281; See generally §605(e).[1] Moreover, Congress has equated a violation of the Statute to theft of service.  See 1988 U.S. Code Cong. & Admin. News. 7, 5577, 5642-43.  In 1988, in an effort to further deter theft, Congress amended the Statute to provide for more severe penalties for violations.  Id. at 5657.

Accordingly, a party aggrieved under the Statute may recover statutory damages of up to $10,000.00 for each violation thereof.  §605(e)(3)(C)(i)(II).  Moreover, if the Court finds that the violation of the Statute was committed "willfully and for purposes of direct or indirect commercial advantage or private financial gain..." the Court may award additional damages of up to $100,000.00 for each violation.  §605(e)(3)(C)(ii). Furthermore, a Court shall award full costs, including reasonably attorneys' fees. §605(e)(3)(B)(iii).  Because J&J Sports Production, Inc. constitutes an aggrieved party under the Statute, see §605(D)(6), J&J Sports Production, Inc. is entitled to damages from the Defendant for her unlawful acts.

It is obvious that the Defendant's interception, receipt and broadcast of the Event was not innocent.  Section 605(e)(3)(C)(iii) provides for limited damages to the aggrieved party "[i]n any case where the court finds that the violator was not aware and

---

[1] The criminal penalties include fines and imprisonment.  See §605(e)(1) and (e)(2).

had no reason to believe that his acts constituted a violation of this section..."  However,

as stated by Congress, this type of situation occurs rarely,

> [i]t is not intended that this provision serve in any way as a
> defense to a determination of liability under subsection (a),
> but rather only as a provision to be exercised in the court's
> discretion for those rare instances of ignorance of the law on
> the part of one adjudged to have violated it.

Cable Communications Policy Act, P.L. 98-549, 5 U.S. Cong. News. '84 Bd. Vol. 8,

4745, 4751.  Clearly, this was not the instant situation.

As Heveres d/b/a Mi Palenque Bar & Restaurant is a commercial establishment,

it could not have obtained the transmission or the Event had the Defendant not

undertaken specific wrongful actions to intercept and/or receive and broadcast the

telecast.  In order for an unauthorized commercial establishment to receive a broadcast

such as the Event, there must be some wrongful action, such as using an unauthorized

decoder, obtaining cable service and illegally altering the cable service to bring the

signal of the Event into the establishment or moving an unauthorized decoder from its

authorized location to the establishment.  Because the Defendant must have committed

wrongful acts in order to intercept and/or receive and broadcast the Event, there is no

basis for limiting J&J Sports Production, Inc. relief to the $10,000 provided for in

§605(e)(3)(C)(I).

### Statutory Damages Under §605(e)(3)(C)(i)(II)

As its first basis for relief, J&J Sports Production, Inc. is requesting statutory

damages pursuant to §605(e)(3)(C)(i)(II).  See Cable/Home Communication Corp. v.

Network Productions, Inc., 902 F.2d 829, 850 (11th Cir. 1990)[2]  Pursuant to the Statute,

---

[2] It is in the Plaintiff's discretion whether to elect to receive actual or statutory
damages.  Id.

the amount of statutory damages to which J&J Sports Production, Inc. is entitled for the violation shall be not less than $1,000.00 and not more than $10,000.00.

For the reasons set forth, J&J Sports Production, Inc. believes it is entitled to full statutory damages in the amount of $10,000.00 for the violation of the Statute.

As stated supra, on March 19, 2005, the Defendant or agents, servants and/or employees of the Defendant intercepted and received or assisted in the interception and receipt of the live telecast of the Event. They then broadcast or assisted in the broadcast of the Event to the patrons at Heveres d/b/a Mi Palenque Bar & Restaurant for viewing therein. The patrons at Heveres d/b/a Mi Palenque Bar & Restaurant purchased meals and/or drinks while viewing the Event. The patrons whom the Defendant permitted without authorization to view the Event would otherwise only have been able to view the Event at a commercial establishment by paying an admittance fee at an establishment authorized by J&J Sports Production, Inc. to receive the transmission.

The Defendant broadcast the Event to the patrons at Heveres d/b/a Mi Palenque Bar & Restaurant without paying any sublicense fees to J&J Sports Production, Inc. To date, no amount has been paid to J&J Sports Production, Inc. to compensate it for the illegal broadcast of the Event in Heveres d/b/a Mi Palenque Bar & Restaurant.

Statutory damages are appropriate where actual damages are difficult to prove. Lauratex Textile Corp. v. Allton Knitting Mills, Inc., 519 F.Supp. 730, 732 (S.D.N.Y. 1981); Lottie Jonlin Thomas Trust v. Crown Publishers, Inc., 592 F.2d 651, 657 (2d Cir. 1978). The lack of adequate proof of any particular element causes the Court to rely, within its discretion, on the statutory limitations. F.W. Woolworth Co. v. Contemporary

Arts, Inc., 344 U.S. 228, 233 (1952).  In the instant case, as more fully discussed infra, it would be impossible to determine the full extent of the profits lost by J&J Sports Production, Inc. and the additional damages sustained by J&J Sports Production, Inc. as a result of the Defendant's unlawful actions.

Accordingly, it is appropriate for J&J Sports Production, Inc. to elect to receive statutory damages.

Because the Statute defining statutory damage awards for violations of the Copyright Act of 1976, 17 U.S.C. §101 et seq. (the "Copyright Act") is similar to the Statute, its case law is instructive for the determination of the amount of statutory damages to which J&J Sports Production, Inc. is entitled.[3]

According to the United States Supreme Court, when determining the applicable statutory damage award under the Copyright Act, the amount of profits lost by the copyright holder is not the only criteria for a Court to consider.  Woolworth, 344 U.S. at 233.  Rather,

> a rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy.  The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage

---

[3] 17 U.S.C. §504(c)(1) provides as follows:

**Statutory damages**.  (1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum not less than $500 or more than $20,000 as the court considers just.

> wrongful conduct.  The discretion of the court is wide
> enough to permit a resort to statutory damages for such
> purposes.  Even for uninjurious and unprofitable invasions of
> copyright the court may, if it deems it just, impose a liability
> within statutory limits to sanction and vindicate the statutory
> policy.

Id. at 233.

Statutory damages under the Copyright Act should serve to compensate the copyright owners and to provide a detriment to would be infringers.  Lottie Joplin Thomas Trust, 592 F.2d at 657; Lauratex, 519 F. Supp. at 732.  Factors to consider in determining a statutory damage award include: (1) "the market value of the rights infringed", (2) "the revenue lost by the plaintiff and profits gained by the defendant", (3) the infringers state of mind" and (4) "deterrence of future infringement: Basic Books, Inc. v. Kinko's Graphics Corp., 758 F.Supp. 1522, 1544 (S.D.N.Y. 1991).

Applying the Courts' analysis from its decisions under the Copyright Act, in the instant case, the lost income from the sale of the Event to Heveres d/b/a Mi Palenque Bar & Restaurant represents only a starting place for the determination of the amount of damages to which J&J Sports Productions, Inc. is entitled for the Defendant's wrongful acts.

When Congress enacted the Statute, it was specifically cognizant of the problems of theft of various wire communications, including closed-circuit programming, such as the Event.  As stated in the House Bill:

> The Committee is extremely concerned with a problem
> which is increasingly plaguing the cable industry-the theft
> cable service.  This problem has taken on many forms from
> the manufacture and sale of equipment intended to permit
> reception of cable services without paying for it, to apartment
> building dwellers "tapping" into cable system wire in a
> building's hallway that issued for providing service to a

>neighbor's apartment unit, to the sale by building superintendents of cable converters left behind by previous tenants to new tenants.  Such practices does not only often permit one to obtain cable service without paying the installation and hookup costs, but also, for instance, involve individuals gaining access to premium movie and sports channels without paying for the receipt of those services.
>
>Theft of services deprives the cable industry of millions of dollars of revenue each year which it should otherwise be receiving.  The Committee believes that theft of cable service poses a major threat to the economic viability of cable operators and cable programmers, and creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it.

Cable Communications Policy Act of 1984, House Report No. 98-934, 5 U.S. Cong. News. '84 Bd. Vol. -6, 4655, 4720.  Moreover, according to Congress, these incidents threaten to undermine the satellite industry and adversely impact legitimate satellite dealers and satellite programmers who otherwise would be receiving payment for their programming or descrambling devices.  See, U.S. v. Scott, 783 F.Supp. 280, 281 (N.D. Miss. 1992) (quoting 1984 U.S. Code Cong. & Admin. News 4655, 4746).

The impact of theft of this type is far-reaching throughout the entertainment industry.  According to the Office of Cable Signal Theft of the National Cable Television Association, the cable industry loses an estimated 3 Billion Dollars annually as a result of the theft of cable signals.  Cable Piracy Fact Sheet.  Not only do these acts of theft cause legitimate businesses to lose money, but they also weaken the cable signal, thereby adversely affecting the quality of the picture received by authorized users.  Id.

Theft has also adversely impacted the movie industry.  Theft of American movies and television programming, including satellite and cable television programming, has increased 27% since 1990.  News Release, March 18, 1992, Motion Picture Export

Association of America, Inc. ("MPEAA").  According to Jack Valenti, MPEAA's

Chairman and Chief Executive Officer, "[p]iracy is the single biggest problem facing the

motion picture industry today".  Id.  These thefts cost the industry over 1.2 Billion

Dollars annually.  Id.

Similarly, the unauthorized interception, receipt and broadcast of the Event and

other closed-circuit programming threatens the viability of the closed-circuit industry.

There are no countervailing social or policy considerations which justify the

unauthorized interception of these broadcasts.  Cf., ON/TV of Chicago v. Julien, 763

F.2d 839, 843 (7th Cir. 1985); Subscription Television of Greater Washington v.

Kaufman, 606 F.Supp. 1540, 1544 (D.D.C. 1985).

In addition to the lost revenue which would have been derived from the delivery

and exhibition of the Event to Heveres d/b/a Mi Palenque Bar & Restaurant and its

patrons, J&J Sports Production, Inc. should receive additional compensation to account

for any profits gained by the Defendant for meals and/or drinks sold to the patrons as a

indirect result of her unlawful acts.  Moreover, J&J Sports Production, Inc. should be

further compensated as it has been deprived of the "value, benefits and profits derived"

from the unauthorized broadcast of the Event to Heveres d/b/a Mi Palenque Bar &

Restaurant and its patrons as well as the value of "business investment, business

opportunities and goodwill."  See American Television and Communications Corp. v.

Floken, Ltd., 629 F.Supp. 1462, 1466 (M.D. Fla. 1986).  As a result of theft by the

Defendants and others, J&J Sports Production, Inc. has lost and will continue to lose as

customers legitimate commercial establishments which are unwilling and financially

unable to compete with those unauthorized commercial establishments, such as

Heveres d/b/a Mi Palenque Bar & Restaurant, which steal sports and other closed-circuit programming. Because these unauthorized commercial establishments offer the stolen programming to their patrons for no fee or for a fee which is less than the authorized establishments are required to charge, the legitimate commercial establishments with the right to broadcast closed-circuit programming can not attract paying customers. As a result, the authorized commercial establishments fail to recover the sublicense fees paid, suffer the loss of patrons and incur financial loss. When the unauthorized commercial establishment advertises the availability of the stolen programming, the number of patrons at the unauthorized commercial establishment increases and, as a result, J&J Sports Production, Inc. and the authorized commercial establishments suffer additional losses.

Theft of closed-circuit broadcasts, such as the Event, by unauthorized commercial establishments, such as Heveres d/b/a Mi Palenque Bar & Restaurant, adversely affects both J&J Sports Production, Inc. and its customers. J&J Sports Production, Inc. pays substantial fees to obtain the right to sublicense the broadcast of closed-circuit programming to authorized commercial establishments. J&J Sports Production, Inc. primary source of revenue is the sublicense fees which it charges to authorized commercial establishments for the right to broadcast closed-circuit sports and entertainment programming such as the Event.

Clearly, the Defendant's actions have the potential to erode the base of J&J Sports Production, Inc. customers. Each patron of Heveres d/b/a Mi Palenque Bar & Restaurant, is lost as a future patron of authorized broadcasts. See Cox Cable Cleveland Area, Inc. v. King, 582 F.Supp. 376, 381 (E.D. Ohio 1983). But for the

Defendant's unauthorized broadcast of the Event, all or some of the patrons of Heveres d/b/a Mi Palenque Bar & Restaurant would have become paying patrons and directly increased the fees paid to J&J Sports Production, Inc. by its authorized commercial establishments.

Further, J&J Sports Production, Inc. has suffered damage to its goodwill and reputation and loss of its right and ability to control and receive fees for the transmission of the Event.  See Quincy Cablesystems, Inc., 640 F.Supp. at 1161. When negotiating sublicense fees, J&J Sports Production, Inc. generally represents to legitimate commercial establishments the locations of other authorized commercial establishments licensed to receive the programming.  Therefore, when an unauthorized commercial establishment intercepts, receives and broadcasts closed-circuit programming, such as the Event, J&J Sports Production, Inc. reputation and goodwill suffers from what appears like a misrepresentation.  J&J Sports Production, Inc. should receive compensation from the Defendant for these losses suffered.  Furthermore, an incalculable element of damages is the ill-will and possible loss of future business from legitimate commercial establishments which refuse to pay sublicense fees because they cannot compete with unauthorized commercial establishments which steal closed-circuit programming, such as the Event.

The continued viability of J&J Sports Production, Inc. as a business concern depends upon the willingness and ability of legitimate commercial establishments to pay sublicense fees for the right to broadcast closed-circuit sports and entertainment programming, such as the Event.  If such programming is made available to the public for no fee at unauthorized commercial establishments which have not purchased the

right to broadcast such programming, legitimate commercial establishments will find no reason to purchase the right to legally broadcast this type of programming.

J&J Sports Production, Inc. is operating a legitimate business of the type that Congress specifically sought to protect.  That protection, however, is threatened by the Defendant's actions.  This Court must use the full power of the Statute to punish the Defendant for her acts of theft.  If rampant theft of service is allowed to go unpunished and J&J Sports Production, Inc. and similar distributors of protected communications continue to suffer losses as a result of the theft, these businesses could be forced to curtail distribution of this programming, thereby depriving the people of the State of New York of the ability to view these sports and entertainment events.

The arguments set forth herein are also applicable in supporting damages under 47 U.S.C. §553(c)(3)(A)(ii) in the amount of $10,000.00.

Given the benefits which the Defendant received from the broadcasts of the Event and given the additional damages which J&J Sports Production, Inc. has suffered, it is fair and reasonable to assess against the Defendant and award  to J&J Sports Production, Inc. statutory damages in the amount of $10,000.00, pursuant to §§553(c)(3)(A)(ii)and $10,000.00 under 605(e)(3)(C)(i)(II).  Clearly, given the wrongfulness of the Defendant's acts and the losses suffered by J&J Sports Production, Inc. it is entitled to these damages.

### Damages for Willful Act Under §605(e)(3)(C)(ii)

As its second basis for relief, J&J Sports Production, Inc. requesting damages pursuant to §553(c)(3)(B)and 605(e)(3)(c)(ii) because the Defendant's actions were willful and "for purposes of direct or indirect commercial advantage or private financial

gain".  In <u>ON/TV of Chicago v. Julien</u>, 763 F.2d 839, 844 (7th Cir. 1985), the Court of

Appeals for the Seventh Circuit interpreted willful under the Statute as "disregard for the

governing statute and an indifference to its requirements".  <u>Id</u>. at 844 (quoting

<u>TransWorld Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 127 (1985)).

As set forth <u>supra</u>, because of the absence of any way in which the Defendant

could have "innocently" accessed the broadcast of the Event, It is apparent that she

specifically and willfully acted to illegally intercept the transmissions of the Event for her

commercial advantage.  Moreover, as set forth <u>supra</u>, after Patricia Ferrero witnessed

the Event being broadcast in Heveres d/b/a Mi Palenque Bar & Restaurant, she handed

a cease and desist letter to the Defendant's agent which stated that the broadcast was

illegal and should cease.

Clearly, the Defendant's actions indicate disregard of and indifference to the

Statute.  The Defendant knew that it was wrong to receive, intercept and divert the

cable service and the Event and to broadcast it in Heveres d/b/a Mi Palenque Bar &

Restaurant.  Similarly, the Defendant knew that her actions were unlawful particularly

after receiving the case and desist letter, yet, with total disregard for the Statute.  She

nevertheless intercepted and received the transmission and broadcast it to the patrons

of Heveres d/b/a Mi Palenque Bar & Restaurant.  Accordingly, because the Defendant's

actions were willful, J&J Sports Production, Inc. is entitled to additional damages.

The Copyright Act provides this court with a further basis for finding that the

Defendant's actions were willful.  Here too, because the Statute related to damages for

willful violations of the Copyright Act is similar to the Statute, the Copyright Act is again

instructive for the instant case.[4]

In Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.. 807 F.2d 1110 (2d Cir. 1986), aff'd., 862 F.2d 304 (1988) the Court of Appeals for the Second Circuit analyzed the criteria for determining whether actions constitute willful conduct. According to the Court, "a defendant's knowledge that its actions constitute an infringement [of the Copyright Act] establishes that the defendant acted willfully" within the meaning of the Copyright Act. Id. at 1115; Fallaci v. New Gazette Literacy Corp., 568 F.Supp. 1172, 1173 (S.D.N.Y. 1983) (citing 3 Nimmer on Copyright, §14.04 [B][3], at 14-27, 14-28 (1982). There is no need to prove malice or actual knowledge in order to establish a willful violation; constructive knowledge is sufficient. See Fitzgerald, 807 F.2d at 1115; Cable/Home, 902 F.2d at 851. In the instant case, the Defendant's actual knowledge that her acts were wrongful should be sufficient to demonstrate that her acts were willful.

It is patently obvious that the Defendant's actions were "for the purposes of direct or indirect commercial advantage or private financial gain." §605(e)(3)(C)(ii). As stated by Congress,

> [i]t is further intended that the term "direct or indirect commercial advantage or private financial gain" be interpreted broadly by both the courts in deciding actions, and the Department of Justice in pursuing actions, under this section. Those who willfully violate subsection (a) and directly or indirectly enjoy commercial gain from those violations, may be reached.

---

[4] The Copyright Act provides as follows:

(2) In a case where...court finds, that infringement was committed wilfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,000. 17 U.S.C. §504(c)(2).

Cable Communications Policy Act, P.L. 98-549, 5 U.S. Cong. News. '84 Bd. Vol.-8, 4745, 4750.

Because the Event was broadcast to the patrons of Heveres d/b/a Mi Palenque Bar & Restaurant, the Defendant's purpose and intent in exhibiting the Event was to secure a private financial gain and direct commercial advantage by misappropriating J&J Sports Production, Inc. licensed exhibitions and infringing upon J&J Sports Production, Inc. rights, while avoiding proper payment to J&J Sports Production, Inc.

By interpreting the statutory language broadly as directed by Congress, the Court must find that the Defendant's actions were for her commercial gain as set forth in the Statute. Accordingly, as the Defendant's actions were willful and for commercial advantage, J&J Sports Production, Inc. is entitled to additional damages under the Statute.

Generally, it is reasonable to increase an actual or statutory damages award by a specific percentage to penalize the Defendants for willful acts. See e.g. Lauratex, 519 F.Supp. at 733 (an increase of seven times the actual damages for willful acts); Cablevision Systems Corp. v. Maxie's North Shore Deli Corp., 1991 WL 58350, No. CV 88 2834 (ASC) (E.D.N.Y. 1991) (the court awarded five times the statutory damages for willful violations); Cable/Home, 902 F.2d 829 (additional damages of five times actual damages for willful conduct).

As a willful violator of this Statute, the Defendant must be held accountable for a substantial amount above the market value of the sublicense fees to broadcast the Event. Otherwise, other commercial establishments "would be encouraged to violate the law knowing the full extent of their liability would not exceed what they would have

to pay for a license on the open market."  <u>Fallaci</u>, 568 F.Supp. at 1174).

Under the Copyright Act, "when the infringement is willful, 'deterrence of future

violations is a legitimate consideration' because 'defendants must not be able to sneer

in the fact of copyright owners and copyright laws'."  <u>Cable/Home</u>, 902 F.2d at 851

(<u>quoting</u> <u>International Korwin Corp. v. Kowalczyk</u>, 855 F.2d 375, 383 (7th Cir. 1988);

<u>See</u> <u>also</u> <u>Chi-Boy Music v. Charlie Club, Incorporated</u>, 930 F.2d 1224, 1230 (7th Cir.

1991).  Similarly, in the instant case, the award of additional damages must be

sufficiently significant to deter the Defendant and other unauthorized commercial

establishments from stealing protected communications.

Accordingly, it is proper for this Court to award to J&J Sports Production, Inc.

additional damages in the amount of $30,000.00 (three times the statutory damages) to

compensate it for the Defendant's willful acts in connection with the event.

### Attorneys' Fees and Costs

As its third basis for relief, J&J Sports Production, Inc. is requesting payment for

its attorneys' fees and costs pursuant to §605(e)(3)(B)(iii).  Pursuant to the Statute, said

award is mandatory.  Section 605(e)(3)(B)(iii) states, "(the Court... shall direct the

recovery of full costs, including awarding reasonable attorneys' fees..."  <u>See</u> <u>Maxie's</u>,

1991 WL 58350, No. CV 88 2834.

### CONCLUSION

The need for substantial awards to compensate those aggrieved under the

Statute and to deter the Defendant and similar individuals and entities has already been

recognized in this jurisdiction and other jurisdictions.  For the reasons set forth herein,

the Plaintiff respectfully requests the aforesaid relief.

Respectfully submitted,

July 21, 2008

BY:   /s/ Paul J. Hooten

Paul J. Hooten, Esq.
5505 Nesconset Hwy, Suite 203
Mt. Sinai, NY 11766
631-331-0547

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
J&J Sports Production, Inc.
                         Plaintiff,


        -against-                                    Civil Action No. 08-2869
HEVERES CORP.
d/b/a MI PALENQUE BAR & RESTAURANT
and ADELINA RUIZ
and FRANCISCO RUIS
                         Defendant,
----------------------------------------------------X


                        CERTIFICATE OF SERVICE


        I certify that a copy of the Proposed Findings of Facts and Conclusion of Law were
served via U.S. Postal Service, Next Day Mail to the following on July 21, 2008:


Extasis Corp.
d/b/a Extasis Cocktail Lounge
154 E 112 Street,
NY, NY

Andelina Ruiz and Francisco Ruiz
154 E 112 Street,
NY, NY


Dated: July 21, 2008

                                /s/
                                Cheryl Lorefice
                                c/o Paul J. Hooten & Assoc.
                                Attorney for Plaintiff
                                5505 Nesconset Hwy., Ste. 203
                                Mt. Sinai, NY 11766
                                (631)331-0547